**DAWCO CONSTRUCTION,
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 450–86C.

United States Claims Court.

Nov. 17, 1989.

As Amended Nov. 22, 1989.

Richard D. Corona, San Diego, Cal., for plaintiff. Stephen S. Stokwitz, of counsel.

Donald E. Kinner, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

In 1983 the United States awarded a contract to plaintiff for the refurbishment, including landscaping, of a housing project in San Diego, California. The landscaping was subcontracted to J.C. Landscape. A few weeks after award, the landscaping portion of the contract was suspended by defendant for complete redesign of the drainage system. As redesigned, the contract called for landscaping of a significantly smaller area than in the original contract. Plaintiff claimed entitlement to an equitable adjustment increasing the contract price because of differing site conditions and breach of an implied warranty by defendant of the adequacy of the plans and drawings; defendant, a reduction of the contract price to reflect the smaller work area to be landscaped. The claims at bar are limited to the extra work caused by the differing site condition. Plaintiff's claims for delay damages arising from the suspension of the landscaping have been settled by mutual agreement of the parties. For the reasons that follow, the court finds that plaintiff is entitled to an additive equitable adjustment.

## FACTS

The United States, acting through the Department of the Navy, issued an invitation for bids for a contract to refurbish 405 units of the Cabrillo–Larkdale Navy Housing Project located in San Diego, California, including landscaping of the grounds. The resulting contract was for the third and final phase to complete refurbishment of the Project. The phase III contract was substantially larger than either phase I or phase II. This suit, however, is directed only to the landscape requirements of the phase III contract. The Invitation For Bids

(IFB) separated the phase III work into six sections designated areas A through F. Areas A and B consisted of single-family housing with relatively large yards while areas C through F consisted of garden apartments with less area to be landscaped. The contract required removal of some trees and all shrubs, weeds and grass, addition of soil improvements (amendments) by tilling to a depth of one foot, installation of a new underground sprinkler system, planting of trees and shrubs, and rough and fine grading for drainage and hydroseeding. The ground to be landscaped in areas A through F consisted of 903,000 square feet. The IFB contained all of the required contract and bidding clauses plus a "description" of the existing site condition, to wit:

## EARTHWORK

1.4  CRITERIA FOR BIDDING: Base bids on the following criteria:

a.  That the surface elevations are as indicated.

b.  That no pipes or other artificial obstructions, except those indicated, will be countered.

c.  That the character of the material to be removed is as indicated by site inspection.

## SECTION 02800

## LANDSCAPING

5.  JOB CONDITIONS:

5.1  Existing Conditions: Base bids on the following existing job conditions:

a.  That the surface elevations are as shown.

b.  That no pipes or artificial constructions, other than those indicated on the utility plans will be encountered. Notify the Contracting Officer immediately if unforseen [sic] obstructions are encountered.

\*  \*  \*  \*  \*  \*

d.  That top soils found will be suitable for treatment amendment and planting.

\*  \*  \*  \*  \*  \*

7.3.1  Topsoil shall be the existing surface soil.

\*  \*  \*  \*  \*  \*

9.2  Topsoiling: Prior to placing topsoil, scarify the subgrade by disking, harrowing, rototilling or other approved means to a 12″ depth. Spread topsoil evenly to a minimum depth of 4″. Do not spread topsoil when excessively wet or dry.

9.3  Tilling: After the areas have been topsoiled and brought to grade, thoroughly till them to a depth of at least 12 inches by scarifying, disking, harrowing, rototilling or other approved means.

On August 15, 1983 defendant awarded the phase III contract to Dawco. Dawco then subcontracted the landscaping portion of the contract to J.C. Landscape (JCL). JCL had been the landscape subcontractor on phases I and II of the project though Dawco had not been the prime contractor on either. On September 26, 1983, six weeks later, defendant suspended all landscape work on phase III in order to redesign the drainage system. During the period of suspension, defendant issued Change Order Request "A" (COR–A) requesting proposals from plaintiff, and others, for the redesigned landscaping. The COR–A bidding instructions were, as follows:

CRITERIA FOR BIDDING: Base bids on the criteria listed below. Hard material is defined as solid rock, firmly cemented unsatisfied masses, or conglomerate deposits possessing the characteristics of solid rock which can not ordinarily be removed without systematic drilling and blasting, and any boulder, masonry, or concrete except pavement, exceeding ½–cubic yard in volume. Firm material (Linda Vista Poway or Sweiten formation, a ferruginous cemented conglomerate of clay, sand, silt or gravel) is not included in the definition of hard material, however, the firm material usually requires heavy excavation equipment or jack hammer for removal.

a.  That the surface elevations are as indicated.

b. That no pipes or artificial obstructions, except those indicated, will be encountered.

c. That hard materials will not be encountered.

SOLID MATERIALS: In general, shall be free of debris, roots, wood, scrap material, vegetable matter, refuse, soft unsound particles, frozen, deleterious or objectionable materials.

Dawco and the phase II contractor both submitted price proposals to defendant for the COR–A work but both proposals were significantly higher than defendant's cost estimate and well above the funds remaining for the project for that fiscal year. Faced with the inability to fund the entire COR–A redesign, defendant chose to delete all landscape work in Areas C through F, leaving only A and B where no new underground drainage lines would be needed and, it was thought, merely minimal regrading.[1] Accordingly, the only portions of COR–A incorporated into the Dawco contract were minor grade changes in Areas A and B by unpriced Change Order Number 20. The notice to proceed under Change Order 20 was given on May 29, 1984 even though the Change Order was not executed until a later date. Change Order 20 stated:

1. (Deductive) Delete entirely from phases C, D, E, and F of this contract all site work not already performed as of 26 September 1983 or authorized after 26 September 1983.

2. (Additive) Accomplish site work in phases A & B of this contract in accord with original contract drawings and specifications for COR–A as transmitted to you by your letter serial 01701 dated 13 March 1984.

3. All additive work shall be acceptable to the Contracting Officer....

We give this direction with the understanding that a net credit will result.

As a basis for negotiations, submit you [sic] breakdown of costs in accord with the "Pricing of Adjustments" and "Modification Proposals—Price Breakdown" clauses of the General Provisions of this contract as soon as possible.

Upon execution of the notice to proceed pending execution of Change Order 20, JCL resumed performance of its subcontract but, according to plaintiff, conditions had deteriorated significantly at the job site. JCL contended that because there had been little maintenance at the site during the eight-month period of suspension when it recommenced performance it encountered a widespread differing site condition. Shortly thereafter plaintiff claimed an increase in contract price for the differing site condition. Defendant, on the other hand, anticipated a price reduction of $322,500 to the contract as a result of Change Order 20.

## DISCUSSION

We begin the discussion with the natural assumption that a change order reducing the amount of work to be performed in any contract would, on its face, entitle defendant to a corresponding reduction in the price of the contract. Indeed, the premise of the change order was the "understanding that a net credit ..." would adhere to the benefit of defendant. Change Order 20 reduced the area to be landscaped by 433,440 square feet in Phase III, leaving 469,560 square feet of the original area. However 35,900 square feet were added to areas A and B bringing the total amended phase III square footage to 505,460; the overall result was a forty-four percent reduction.[2]

JCL initially offered to plaintiff to perform the Phase III landscaping for $515,000 but under the mistaken assumption that the total area to be landscaped was only 660,000 square feet. Dawco, however,

---

**1.** Areas C through F landscaping was subsequently performed by a separate contractor under a later awarded contract. That later contract did not contain the ideal existing site condition description but, notwithstanding that, the contractor did receive an equitable adjustment for a differing site condition.

**2.** The exact square footage to be landscaped post-Change Order 20 was in dispute. Because plaintiff evidenced several erroneous assumptions of the remaining area, the court chose to accept defendant's computations.

had already received a proposal from another landscaping company to perform the work for $480,000, $35,000 less than JCL's offer. To become the low offeror, JCL lowered its offer to $460,000 even though it knew by that time that the total square footage to be landscaped was 903,000 square feet. Its revised bid of $460,000 equated to fifty-one cents a square foot. Defendant made much of the fact that JCL's bid of $515,000 was for 660,000 square feet and that its square foot price was, therefore, seventy-eight cents. When JCL reduced its price to $460,000 for 903,000 square feet, it brought the square foot price down to fifty-one cents a square foot. Thus, defendant argued, JCL had significantly underbid the contract and this action was nothing more than an ill-conceived attempt to recoup its loss through a differing site conditions claim. This argument, however, was without merit.[3] JCL had been the landscape subcontractor on Phase I of the project for which it had bid fifty-one cents a square foot. During performance of Phase I differing site conditions were encountered for which the prime contractor, on behalf of JCL, received from defendant an estimated additional $80,000. JCL was also the landscape subcontractor on Phase II for which it bid fifty-five cents a square foot. JCL's bid of fifty-one cents a square foot can only be viewed as in line with its other bids and, therefore logical, and not supportive of a charge that it underbid Phase III. Because (1) JCL's bid was in line with its earlier bids, (2) it knew the actual square footage to be landscaped and (3) it intentionally reduced its offer in order to obtain the subcontract, the court must conclude that JCL intended to perform all 903,000 square feet of the Phase III landscaping for $460,000. This is also supported by JCL's affirmation at trial that it had intended to bid fifty-one cents a square foot for the full 903,000 square feet and that it expected to perform the subcontract at a profit at that price.

Initially JCL also underestimated the square footage of areas A and B of Phase III. JCL believed the area to be landscaped in Areas A and B to be 330,000 square feet whereas, we have seen, it was 505,460 square feet. But because JCL had intentionally agreed to perform the Phase III landscaping contract for fifty-one cents per square foot, the court is compelled to apply the same per square foot price to Areas A and B as it did for Areas A through F, with an adjustment for loss of economy of scale. Thus, the gross price for the JCL subcontract, at the reduced square footage, computed on a basis of fifty-one cents a square foot, was $257,785 (505,460 sq. ft. $\times$ .51).

The court now turns to the analysis of plaintiff's claims. Plaintiff filed written differing site condition claims with the contracting officer's representative several times during the course of performance of the contract on the grounds that the subsurface physical conditions differed materially from what was described in the contract. The contracting officer denied those claims and plaintiff subsequently brought suit in this court.

In the case at bar, the solicitation required all bidders to base their bids on the "existing conditions" described in the IFB. The purpose of a "differing site conditions" clause is to deter a contractor from bidding on a worst-case scenario and adding a contingency factor to its bid. *See Foster Constr. C.A. v. United States*, 435 F.2d 873, 887, 193 Ct.Cl. 587 (1970); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) (in order to recover under a differing site conditions clause, the contract documents must be reasonably plain or indicate positively that such subsurface conditions would be otherwise than actually found). The subsurface description of the project site was not in the usual form found in government con-

---

**3.** Defendant went so far as to speculate that JCL went now out of business because of losses it suffered on this contract. If defendant wishes to speculate, it might also consider that the reason was because defendant refused to recognize the validity of JCL's request for an eq-

uitable adjustment. Few small businesses could exist for long, if owed but not paid, nearly half a million dollars over a period of five or more years. It could not obtain operating loans, bonds, etc.; hence, no work.

tracts with which the court is familiar. As seen, the subsurface description was in the "Criteria For Bidding" section of the IFB and COR–A where bidders were instructed to submit bids on the basis of described conditions which can only be described as ideal. The late Mr. Richard Thurman, defendant's civil engineer contract manager for the project, assured the court that this form of subsurface description linked to the bidding instructions had been used many times before by the Department of Navy with claimed success. Moreover, in its post-trial brief, defendant referred to that language as the "site description." The usual form of descriptive notice is a straight-forward statement of what defendant opined its contractor would encounter or where the bidder could find information pertinent to the job site. Defendant's action in limiting the scope of possible events that could occur by directing plaintiff to ignore any known or suspected subsurface differences explicitly and plainly told plaintiff that there were no adverse subsurface differences that would be encountered and, impliedly, that if differing site conditions were found they would be addressed through the remedial Differing Site Conditions clause of the contract. Mr. Thurman testified that defendant had contracted with plaintiff to perform landscaping under an express agreement that any and all encounters with conditions different from the ideal existing conditions stated in the IFB would be reimbursed by defendant. In considering these claims, the court was drawn back time and again to the contract documents directing bidders to submit their bids upon ideal conditions.

The Differing Site Conditions clause of the contract sets forth two different theo-ries of recovery. The first, Type I, would permit recovery of excess costs incurred by the presence of subsurface conditions that differ materially from the description of the subsurface in the contract. Type II would permit recovery of excess costs if unknown and unusual conditions are discovered that differ materially from what would normally be expected for the type of work called for in the contract. Plaintiff has made both Type I and Type II claims.

The Differing Site Conditions clause required the contractor to give prompt notice in writing to the contracting officer and not disturb the differing condition until the contracting officer has had an opportunity to view the site.[4]

### A. *Plaintiff's Type I Claim*

■ To prevail on a Type I claim, plaintiff must demonstrate that the conditions described or indicated in the contract documents were materially different from those encountered during performance. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) (citing *Arundel Corp. v. United States*, 515 F.2d 1116, 1128, 207 Ct.Cl. 84 (1975)). The scope of the phrase "indicated" depends upon interpretation of the contract. Therefore, classifying its definition is a matter of law to be determined at the court's discretion. *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 51 n. 5 (1983), *aff'd*, 754 F.2d 338 (Fed.Cir.1985); *Mojave Enters. v. United States*, 3 Cl.Ct. 353, 357 (1983). The term "contract documents" is to be interpreted with considerable breadth to include not only the bidding documents (Invitation for Bids, drawings, specifications and other documents physically furnished to bidders) but also documents and materi-

---

**4.** (a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.
(b) No claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required in (a) above, provided, however, the time prescribed therefor may be extended by the Government.

als mentioned in the bidding documents as well. *See, e.g., Hunt & Willett, Inc. v. United States,* 351 F.2d 980, 168 Ct.Cl. 256, 268–79 (1964). Evidence as to a material difference is most commonly illustrated by a showing that a larger amount of work was exerted than initially contemplated, or that an alternative method of workmanship was needed in order to complete the contractual agreement. To determine whether plaintiff has made such a compensable showing, the court must place itself into the shoes of a "reasonable and prudent" contractor, *H.N. Bailey & Assocs. v. United States,* 449 F.2d 387, 390, 196 Ct.Cl. 156 (1971), and ascertain whether the conditions shown to be actually encountered were reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding. *Pacific Alaska Contractors, Inc. v. United States,* 436 F.2d 461, 469, 193 Ct.Cl. 850 (1971). A contractor will not be awarded an equitable adjustment for a differing site conditions claim unless the contract indicated specifically what the conditions were that one might expect. *P.J. Maffei Bldg. Wrecking,* 732 F.2d at 916 (citing *S.T.G. Constr. Co. v. United States,* 157 Ct.Cl. 409, 414 (1962)); *Foster Constr. C.A. & Williams Bros. v. United States,* 435 F.2d 873, 875, 193 Ct.Cl. 587 (1970). "[A]ll that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in this contract.'" *Foster,* 435 F.2d at 875 (quoting the trial commissioner who reviewed the parties' cross-motions for summary judgment). Plaintiff must also prove that it reasonably relied upon its interpretation of the contract and contract-related documents, and that it was damaged as a result of the material variation between the expected versus the encountered conditions. *See Sanders Constr. Co. and Ray Kizer Constr. Co. v. United States,* 618 F.2d 121, 220 Ct.Cl. 639, 641 (1979). Finally, if and when these elements have been established by plaintiff, it must demonstrate that its claimed excess costs were solely attributable to the materially

different subsurface conditions within the contract site. *See P.J. Maffei,* 732 F.2d at 916 (citations omitted). The burden of proof upon plaintiff is whether the preponderance of the evidence supports its position. *Weeks Dredging & Contracting, Inc. v. United States,* 13 Cl.Ct. 193 (1987). To escape liability, defendant must show by the preponderance of the evidence that plaintiff acted unreasonably or not efficiently. R. Nash & J. Cibinic, Administration of Government Contracts 480–81 (2d ed.1985).

*Stuyvesant Dredging Co. v. United States,* 11 Cl.Ct. 853, *aff'd,* 834 F.2d 1576 (Fed.Cir.1987), identified three elements that must be met in order to establish a Type I right to an equitable adjustment: (a) that the conditions encountered by plaintiff differed materially from those indicated in the contract documents, (b) that the differing condition could not have been reasonably anticipated from the site examination and review of the contract drawings, and (c) that plaintiff, in fact, relied on its interpretation of the contract drawings. *Id.* at 858 (citing *Sanders Constr. Co. and Ray Kizer Constr. Co. v. United States,* 618 F.2d 121, 220 Ct.Cl. 639, 641 (1979); *Pacific Alaska Contractors, Inc. v. United States,* 436 F.2d 461, 469, 193 Ct.Cl. 850 (1971); and *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir. 1984)).

### 1. *Conditions must differ*

■ Element (a) poses the ultimate question in every differing site condition case, *i.e.,* whether the conditions encountered by the contractor were materially different from those reported in the specifications of the contract. *E.g., P.J. Maffei,* 732 F.2d at 916. No contract drawings in the record depicted subsurface conditions but the terms of the IFB and COR–A advised that there were no subsurface pipes or artificial obstructions and "that the subsurface would.... be free of debris, roots, wood, scrap material, vegetable matter, refuse, soft unsound particles, frozen, deleterious or objectionable materials." The only noted physical subsurface condition was the

abandoned lawn watering system eighteen inches beneath the surface.[5] The language in the IFB and COR–A directed bidders to prepare and submit their bids on the basis of ideal existing conditions and can only be interpreted for the purpose of this type claim as meaning just that; the existing conditions were ideal. For this reason, any physical obstruction of any significance, with the sole possible exception of the existing lawn watering system, would constitute a condition that differed from that indicated in the contract documents. *See id.*

Defendant argued that no Type I existing site condition was described in the contract and, therefore, plaintiff had no basis for recovery. The court does not know whether defendant based that argument on the fact that the description was contained in the IFB as opposed to the contract itself, or because none of the later discovered conditions were specifically described. Regardless, the court finds defendants argument to be without merit. The court has previously disposed of the first basis. Under defendant's second theory, defendant would have the court deny plaintiff recovery under a type I claim if, for example, plaintiff encountered long strands of subsurface cable and the contract documents did not state that there were no long strands of subsurface cable.

The court has carefully and thoroughly analyzed the evidence and testimony and concluded that plaintiff did encounter subsurface different conditions other than described in the contract documents. The parties, in fact, stipulated that conditions different from those described in the existing conditions section of the contract documents had been encountered.[6] The court was persuaded to a great extent by the photographs of the job site taken after the suspension but before and during landscaping. Those photographs clearly show to the satisfaction of the court the presence of cable, large root masses, rocks of all sizes (some apparently several yards in circumference), concrete, and large piping clearly from something other than the abandoned lawn watering system. Plaintiff testified that the subsurface conglomeration of rocks that were discovered were not at any particular site but were pervasive throughout the entire project area. JCL met rock obstructions at every turn with subsurface rocks as large as three to four feet in diameter. In fact, Mr. John Fuller, President of JCL, testified that "it was solid rock."[7] Plaintiff and JCL also discovered weed masses that had grown during the unattended period of suspension to a height of two to three feet and higher with subsurface root masses ranging from two to ten inches in diameter making them much more difficult to remove. Weed root masses had become inextricably intertwined with the tree roots, in large but unspecified areas, forcing JCL to remove the obstructions and necessarily the surrounding soil. This removal of soil required additional topsoil to be brought onto the site to bring those areas, as well as areas around the existing sidewalks that were not at the proper elevations (contrary to what was stated in the contract documents), up to the elevations required by the contract.

As testified to, and as depicted in the photographs, JCL could not remove the thatch over the area, as required by the contract, by scraping the surface.[8] The size of the root masses were so large that the equipment would "bog down" and JCL often had to go far deeper than the usual one inch to remove the thatch from the

---

5. The contract and COR–A stated that there were no underground artificial obstructions except as shown on the "utility plans." However, no such plans could be located in the record. Drawings L–13 through L–25 depict the new lawn watering system to be constructed by plaintiff but do not identify the old. Drawing L–25 does contain an unnumbered note that the "[e]xisting irrigation system shall be abandoned, except for existing 2" water meters for irrigation service."

6. The parties stipulated that JCL encountered quantities of rocks, overgrown weeds, extensive weed and tree root masses, concrete and cobble.

7. The record specifically showed that JCL found the subsurface to be almost a solid "mass of rocks," not one solid rock.

8. Contract Drawing L–24, "Notes," "all existing lawn & thatch to be completely removed...."

grass and weed roots. Mr. Lance Edmundson, a Bobcat owner/operator who contracted with JCL to remove the thatch buttressed plaintiff's statements about the underground obstructions. Mr. Edmundson described Areas A and B after the suspension as "[e]xtremely overgrown." The thatch, after not being maintained for eight months, was much higher and thicker on the surface and the root mass had penetrated deeper than would normally be the case. Mr. Edmundson could not see the tree surface roots because of the density of the weeds in the thatch. In that sense, what had been on the surface prior to the suspension had become in effect subsurface post-suspension. Mr. Edmundson, and others, testified that before a landscaper could begin work in an area, the thatch, including grass, weeds and roots, had to be removed to the base of the root mass. Thus, surface running and shallow subsurface tree roots would have to be removed. When Mr. Edmundson attempted to get beneath the overgrown thatch he found that the weed roots were tightly intertwined and had penetrated into the tree roots; it was impossible to remove the thatch without removing tree roots, even though the tree roots were deeper in spots than the twelve inches that plaintiff was contractually obligated to till and scarify. Referring to one of the photographic exhibits of a tree/thatch root mass, Mr. Edmunson stated "we could hardly get it away from the sidewalks without taking the sidewalk up." He described the subsurface that he encountered as varying across the site. In the large back lawns of Areas A and B there were a great many large, round cobble rocks. He found the whole area to be full of baseball down to golf-ball sized rocks with many six to eight inches across. He also discovered what was described as "a hodge-podge of demolition material that apparently had been imported in years past consisting of bits of cable, some asphalt, and concrete." He expressed surprise to discover the demolition material a few inches beneath the surface. Demolition material is waste from other construction projects that is typically used as land fill elsewhere but covered with about three feet of demolition material-free soil. Mr. Edmundson testified that his Bobcat was rated at twenty tons of "push" but that he was severely impeded in removing the thatch and tilling the soil. The court found Mr. Edmundson a highly credible witness not only because of his demeanor, forthrightness, objectivity, and candor but because he actually worked on the project yet was not a party nor an employee of one of the parties and had no apparent vested interest in the outcome of the litigation.

The contract required that plaintiff till the soil to a depth of twelve inches in preparation for amendment to the soil. Mr. E. Robert Bichowsky, an expert witness in horticulture, agronomy, arboriculture and landscaping in Southern California, and a most impressive witness, agreed with plaintiff's assertions that the discovered subsurface physical conditions were intolerable. When he found that JCL had tried to till the soil to a depth of twelve inches but with no success, Mr. Bichowsky, by letter of June 8, 1984, advised JCL to "refrain from deep ripping of the lawn areas. The soil is so full of rocks that you would bring them to the surface thereby creating a major job to remove them.... I would work the specified amendments in no deeper than two inches." Mr. Bichowsky's testimony addressed an area he estimated to be about 1,600 square feet but he did recognize that other areas could have had identical problems which, indeed, the court finds was the case. As a result of Mr. Bichowsky's letter, Mr. Thurman and plaintiff informally agreed to a change in the contract to reduce the tilling requirement from twelve inches to two inches, with a credit to defendant. Plaintiff had estimated that it would cost an additional $52,000 to till to the contract depth of twelve inches. According to Mr. Thurman, defendant made a conscious decision to accept a lesser quality product, i.e., two-inch tilling, and not incur the additional $52,000 cost. This event occurred early in the post-suspension period and is certainly persuasive of the fact that defendant knew of the differing site condition and the difficulty JCL experienced in working the site. In

any event, the record is clear that ultimately the area was tilled at neither two inches nor twelve inches but instead at various depths between two inches and, by necessity, deeper than twelve inches. Contrary to defendant's argument no change order was ever executed by the parties to implement the informal two-inch tilling agreement. The primary reason being that in many areas the earth could not be effectively tilled at a two-inch depth any more than it could the original twelve inches. When JCL tilled at two inches it continued to encounter the thatch/tree roots, rocks, demolition material and other foreign matter. For example, to till to a depth of two inches in any given area often required the removal of a root or stone as deep as a foot or more. It was a matter of impracticality if not impossibility to implement Mr. Bichowsky's recommendation. During discussions at the job site and later at trial, defendant admitted that many large and undefined areas contained subsurface rocks and cobble that hindered plaintiff's progress. As those areas were tilled, the rocks and cobble were raised to the surface thereby requiring extra effort by plaintiff to remove them because, obviously, grass could not be effectively sown on a rock strewn surface.

In a related matter, plaintiff alleged that it found the presence of roots to be pruned or removed, both surface-running and subsurface, to be far more extensive than had been described. According to Mr. Thurman, the contract indicated the presence of surface-running roots "at the very minimum in the areas where surface-running roots were to be root-pruned." Several of the on-site tree species, primarily ash, normally have surface-running roots. Unfortunately, there was never any contemporaneous document identifying those roots to be pruned. As stated by Mr. Thurman, "[t]here was no designation … as to how many were contract roots and how many roots were potentially change order roots." Mr. Thurman did testify that on one of his few site visits he saw numerous large roots piled in the road to be removed from the site. He also saw plaintiff in the process of removing a large subsurface root.

The IFB also instructed bidders to base their bids on the presence of suitable topsoil for soil amendment and planting which, in turn, required that the earth be ripped or tilled, neither of which could be accomplished over surface-running roots or roots within the depth to which plaintiff was to amend the soil. Mr. Thurman said it best when he testified that the roots in issue had to be removed and the method the contractor chose to use would not work without engaging in extensive root removal. Mr. Thurman also cleared any doubt as to why the two-inch tilling versus the twelve-inch did not apply to removal of the tree root systems by stating that he viewed the tree root issue as being different from the general amendment/tilling requirement. According to defendant, plaintiff should have amended the soil by tilling it to a depth of two inches with the credit to defendant. We now know that that could not be done. Moreover, plaintiff had removed a number of trees as required by the contract but left intact their root systems, many of which had grown under and destroyed sidewalks and driveways. Defendant argued that this should have no bearing on the tilling issue because the standard practice was to leave the roots of removed trees in the soil. However, defendant overlooked the fact that the majority of the trees on site had roots approximately nine inches and more under the surface, well within the tilling zone and the area containing the lawn watering system to be removed. Accordingly, many of those roots causing damage to sidewalk and driveways also had to be removed.

In sum, plaintiff alleged that it encountered subsurface hard material, an abundance of large rocks and cobble, heavy tree roots, concrete, galvanized piping, old asphalt, old concrete and lengths of cable. In addition, much of the topsoil could not be used but instead had to be imported to the job site.

2. *Conditions not reasonably anticipated*

Satisfaction of element "(b)" requires proof that the differing site condition could

not have been reasonably anticipated from the site examination and review of the contract drawings. *Pacific Alaska Contractors, Inc. v. United States*, 436 F.2d 461, 469, 193 Ct.Cl. 850 (1971). The adequacy of a pre-bid site investigation is measured by what a reasonable, knowledgeable and experienced contractor would have expected to discover. *See generally Stock & Grove, Inc. v. United States*, 493 F.2d 629, 635–39, 204 Ct.Cl. 103 (1974). For a Type I claim the contractor is held to what a relatively simple site viewing would reveal. The prospective bidder is entitled to rely on the accuracy of information included in the solicitation. He is under no obligation to conduct his own surveys or go beyond what a simple sight viewing might reveal. *See United States v. Atlantic Dredging Co.*, 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920). In fact, the Armed Services Board of Contract Appeals held in a highly persuasive case, *Fortec Constructors*, 82–2 BCA ¶ 15,845, 1982 WL 8904 (1982), that a contractor could recover on its claim where it could have found the differing site condition only by searching for it.

There was a difference of opinion as to whether Dawco and JCL viewed the entire site prior to bidding. However, Messrs. Benson and Fuller described their independent site investigations. The record is clear and the court so finds that they did view the entire site in a proper manner prior to bidding. Both Mr. Benson and Mr. Fuller described the site to be in good condition with no visible conditions differing from those stated in the IFB. Both men were experienced, knowledgeable contractors who performed what site examination was required of them to support a Type I differing site conditions claim. Assuming, *arguendo*, that plaintiff had discovered, on the site viewing, a condition different from that described in the IFB, the most it could have done was inform defendant of that fact. Defendant then could have amended the IFB to include the condition in the existing conditions statement with attendant higher costs. This is highly speculative. Mr. Thurman testified that no funds were available to pay for any increased level of work and it was the clear

intention of defendant to describe the existing conditions unrealistically and to later reimburse plaintiff, possibly from following fiscal year funds, for all differing conditions. In fact, at one point defendant asked plaintiff to stop submitting unsolicited requests for change orders until the project was more complete.

Plaintiff's review of the contract drawings is in reality a non-issue because no existing subsurface obstructions were shown on the drawings with the exception of the note on drawing L–25 to abandon the system. For the record, the court was satisfied that the drawings were properly and completely reviewed by Messrs. Benson and Fuller.

### 3. *Reliance*

Element (c) requires that plaintiff show that it relied upon its interpretation of the drawings. Normally a contractor is responsible for patent contradictions in the contract documents and need not make unreasonable assumptions of site conditions. *Stock & Grove, Inc. v. United States*, 493 F.2d 629, 204 Ct.Cl. 103 (1974). Contractors are also not required to inspect documents not a part of the contract but are charged with information contained in data furnished as part of the contract and available to bidders. *See Pleasant Excavating Co. v. United States*, 229 Ct.Cl. 654, 656 (1981) (citations omitted). In the case at bar the only relevant information furnished in the contract drawings referenced the defunct lawn watering system. The record is clear that plaintiff and JCL relied upon the fact that the watering system was eighteen inches beneath the surface as it was supposed to be and thus, with the exception of the pop-up spray heads, outside of the twelve-inch physical scope of the contract. There were no other site subsurface physical conditions described in the contract documents except for the oft-noted "all is well" language in the IFB and COR–A.

The court finds that plaintiff has met the burden of proof prescribed in the three elements of *Stuyvesant Dredging Co. v.*

*United States*, 11 Cl.Ct. 853, *aff'd*, 834 F.2d 1576 (Fed.Cir.1987).[9]

### 4. *Notice*

The Differing Site Conditions clause also requires that plaintiff give "prompt" notice to defendant of the alleged differing site and not disturb the site until defendant has had a reasonable opportunity to investigate the claim. The notice need not be in any particular form and may even be oral and given to the contracting officer's representative. All that is necessary is that defendant be generally informed of the facts surrounding the claim. It is not necessary that the communication be accompanied by detailed documentary evidence. *See, e.g., Shepherd v. United States*, 113 F.Supp. 648, 125 Ct.Cl. 724 (1953). Plaintiff bears the burden of proof that oral notice was given but the trier of fact must make the determination in the case of conflicting testimony. *See Schnip Bldg. Co. v. United States*, 645 F.2d 950, 953–59, 227 Ct.Cl. 148 (1981). Moreover, once notice is given it need not be given again when the same conditions recur on the site. *Allied Contractors, Inc. v. United States*, 277 F.2d 464, 466, 149 Ct.Cl. 671 (1960). The notice requirement may even be waived if the court finds that defendant had actual or constructive notice of the conditions encountered. *See Hoel–Steffen Constr. Co. v. United States*, 456 F.2d 760, 765–68, 197 Ct.Cl. 561 (1972). Plaintiff may recover if defendant is not prejudiced by the lack of notice but defendant has the burden of showing it was prejudiced or disadvantaged by plaintiff's failure to give notice. *G.M. Shupe Inc. v. United States*, 5 Cl.Ct. 662, 727 (1984). In the latter instance, prejudice to defendant can be shown by how the passage of time obscured the elements of proof or how defendant could have minimized the extra work and attendant costs had notice been given. *See Schnip Bldg. Co. v. United States*, 645 F.2d 950, 959–60, 227 Ct.Cl. 148 (1981).

In the case at bar, JCL encountered no difficulty in performing the limited landscaping it did during the six-week period between award of the contract and suspension for redesign. The differing site conditions were first encountered shortly after JCL began performance of its subcontract following the May 29, 1984 notice of termination of the suspension. It would appear to the court that a differing subsurface site condition cannot be identified as such immediately. It does not spring forth with full force labeled "differing site condition." Rather, some time must be spent working in the area before it can be reasonably realized that the site truly differs from the description in the contract documents. A single attempt to till a small area may show the presence of rock, intertwined root masses, etc., but it is unknown whether that condition is limited to only a small, isolated area. One aberrant rock or root does not necessarily constitute a differing site condition. It is not until the contractor has had more time to work in an area that it would become apparent that the site condition differed from what the contractor was told to expect. This inherent time for discovery of a differing site condition affects the definition of "prompt" notice. It is only after that discovery time that

9. In our discussion of the elements necessary to prove a differing site condition, the court was not unmindful of *Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193 (1987), *aff'd*, 861 F.2d 728 (Fed.Cir.1988), which identifies six elements, to wit:

(i) the contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of the plaintiff's claim; (ii) the contractor must have acted as a reasonably prudent contractor in interpreting the contract documents; (iii) the contractor must have *reasonably* relied on the indications of subsurface conditions in the contract; (iv) the subsurface conditions actually encountered, within the contract site area, must have differed *materially* from the subsurface conditions indicated in the same contract area; (v) the actual subsurface conditions encountered must have been reasonably unforeseeable; and (vi) the contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions *within the contract site*. *Id.* at 218 (emphasis in original) (citations omitted). The court chose not to discuss the elements as set out in *Weeks* because its six elements were subsumed in the three elements of *Stuyvesant* just discussed. As the elements in *Stuyvesant* were met, so were the elements in *Weeks*.

"promptness" can reasonably be measured. On June 12, 1984, twelve days after start-up, Mr. Thurman received a cost proposal for Change Order 20 and a request for a $54,000 change order from plaintiff's counsel based upon the difficulty encountered by JCL in performing its subcontract because of the massive amount of rock and unsuitability of topsoil. Mr. Thurman testified that he considered this appropriate "notice" under the differing site conditions clause but claimed that it was not appropriate notice of other differing conditions for which he first received notice on November 13, 1984 when the parties met to negotiate equitable adjustments to the contract for all of the obstructions encountered by JCL. Further, Mr. Thurman testified that he never received specific notice of weed root mass, pipes, concrete, asphalt, and cable as differing site conditions. Prior to that testimony, however, Mr. Thurman had admitted that he knew, as of June 12, 1984, of the problems caused by piping in the soil unrelated to the abandoned watering system. Giving JCL a few days to mobilize after suspension and to discover that the differing condition was widespread, and in light of Mr. Thurman's admission of knowledge of some differing conditions on cross-examination, it was reasonable to find that Mr. Thurman knew of the differing condition of the soil, subsurface piping, and other obstructions within a week of discovery by plaintiff and, accordingly, notice was "prompt."

Mr. Thurman testified that he had responsibility for numerous projects and only visited the Cabrillo–Larkdale site a few times during the term of the contract. However, the landscape designer, also an employee of the Navy, visited the site often. Unfortunately, Mr. Thurman and the landscape architect never discussed the progress and/or problems encountered by JCL, not even the presence of massive amounts of rocky soil and unsuitability of the topsoil—both of which were differing site conditions. Further, the record indicated that Mr. Thurman apparently never personally visited the site to specifically view plaintiff's claims of massive rock accumulations and unsuitable topsoil nor did he direct any other agent of defendant to visit the site to determine the veracity of plaintiff's claims. He took little, if any, action to learn more about the site conditions. As Mr. Thurman admitted at trial: "I do not claim perfect contract management."

Given the time to calmly contemplate the actions of the parties and to apply them rationally to the law of differing site conditions, and in light of the factual circumstances, the court found that plaintiff gave timely, sufficient notice to defendant of a differing site condition. This finding was not inconsistent with the purpose of requiring prompt notice under the present circumstances to give defendant an opportunity to observe the condition and make changes to the contract performance requirements if it were in defendant's best interests. The record is clear that after determining that it had discovered at least two subsurface obstructions constituting a differing site condition, plaintiff promptly notified defendant. Yet, Mr. Thurman declined to observe the condition, much less address it contemporaneously, even though he often had an agent, the landscape designer, on site. This court has always been reluctant to bar a changed condition claim for failure to give notice where government officers possess actual knowledge of those conditions. See Shepherd v. United States, 113 F.Supp. 648, 125 Ct.Cl. 724 (1953). It is true that Mr. Thurman was not told with specificity of all of the differing materials obstructing JCL's performance, but those materials of which Mr. Thurman did receive prompt notice were generic to all of the project area. The fact that he was notified of a differing site condition was enough. Allied Contractors, 277 F.2d at 466. Moreover, the differing material obstructions that were discovered in the course of the contract could not be minimized easily by defendant. At the time JCL moved onto the site following the period of suspension, plaintiff had virtually completed its rehabilitation of the housing. The landscaping could not be ignored, delayed or deleted from the contract. The land had to be graded to ensure water

drainage to protect the homes and a lawn watering system is virtually a necessity in the San Diego area. As a result, any failure, *arguendo,* to notify defendant of the myriad of specific other different materials encountered could not be prejudicial to defendant. Defendant proffered no rational evidence to show how it could have minimized the extra work and attendant costs. *Schnip Bldg. Co. v. United States,* 645 F.2d 950, 953–60, 227 Ct.Cl. 148 (1981).

In an attempt to minimize its exposure to plaintiff's claims, defendant tried to show that JCL had performed "in an inefficient" manner thereby unreasonably increasing its costs. The burden of proof rests upon defendant to show that plaintiff's expenditures in working with the differing site conditions were unreasonable. *See Allied Contractors,* 277 F.2d at 465–66. Defendant put forth two instances of ostensible inefficiency on the part of JCL. First, Mr. Thurman witnessed two Bobcats facing each other with their buckets beneath a large deep tree root trying to bring it to the surface for removal. The Bobcats rocked back and forth in the effort. Mr. Thurman testified that in his opinion it would have been more efficient to have brought a larger piece of equipment on site to remove the root and, in any event the root was deeper than twelve inches and need not have been removed under the terms of the contract. Plaintiff countered that larger, less nimble equipment could not have been brought on-site because of the presence of power lines and the sharp angles the equipment had to make around homes and trees. Further, plaintiff explained that the particular root that Mr. Thurman observed had to be removed in order for JCL to place a section of the new lawn watering piping at the proper contract depth. The court is satisfied that equipment larger than a Bobcat could not work effectively or efficiently on site for the reasons stated by plaintiff. In fact, for plaintiff to have gone to the time and expense of temporarily bringing larger equipment on site would in and of itself have been inefficient. Mr. Thurman's claim that larger equipment would have been more efficient for the work he observed would

have run counter to his goal of not increasing costs. The court finds that this instance of alleged inefficiency is without merit. Mr. Thurman also alleged that JCL failed to use its advantage of economy of scale by purchasing items and material on a piecemeal basis rather than purchasing all of any item at one time at a lesser unit price. Defendant offered nothing more than this bare conclusion. No proof was offered that piecemeal buying in this instance was inefficient or even occurred. In fact, the converse may have been true. It could have been inefficient to have bought all plants and shrubs at one time and had to have stored and tended them until they were needed. Neither did defendant offer any proof that JCL had not bought in volume, and arranged for delivery and payment upon its daily or weekly needs. The court can give no credibility to Mr. Thurman's unsupported conclusions.

The court accordingly finds that defendant was timely notified of differing site conditions, that it made no serious effort to observe, much less address them, and that even had it investigated, it failed to convince the court that it had been prejudiced or that there was any practicable solution to the encountered problems. The court finds that other subsurface conditions found by plaintiff were of the same nature as the early reported conditions and that the failure to give more prompt written notice was not prejudicial to defendant. *Schnip Bldg. Co. v. United States,* 645 F.2d 950, 953–60, 227 Ct.Cl. 148 (1981). No changes could have been made by defendant to its benefit. Under the circumstances, prompt notice of the later discovered hard material, concrete, galvanized piping, old asphalt and concrete, and lengths of cable would have been a useless act, at the least, under the facts of this case.

A careful study of the complete record with a special interest in the testimony and the credibility of the witnesses led the court to the inescapable conclusion that JCL did in fact encounter unexpected massive rambling dispersed subsurface running tree roots, rock, boulders, cobble, abandoned water lines not shown on the

drawings, weed root masses, demolition debris, galvanized copper piping, asphalt, concrete and additional grading requirements all of which differed from the description of existing conditions in the contract documents and was damaged thereby. The court accordingly finds that plaintiff did encounter a Type I differing site condition. Because the court has found a Type I differing site condition, it need not address whether plaintiff also encountered a Type II differing site condition or whether defendant breached any implied warranty of the adequacy of the plans and drawings.

### B. *Damages*

#### 1. *Quantum for the differing site condition*

■ Having found liability the court must next determine the amount of the equitable adjustment to which plaintiff is entitled under the contract. On October 31, 1984, JCL at defendant's request, submitted a claim for expenses it had incurred to that date with twenty-five percent more needed to complete the job. The estimated total claim was $575,000. Defendant objected because the claim was presented as a total cost claim, the least reliable method of determining quantum. *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 965, 173 Ct.Cl. 180 (1965). Plaintiff argued that its claim was not a "total cost" claim because it was separated into components of labor, materials, equipment, salaries, overhead, subcontractor costs, etc., as much as it could be separated due to the size of the area and the varying amounts of different material constituting the differing condition.[10] At Mr. Thurman's request, plaintiff resubmitted its claims based on actual costs incurred. Mr. Thurman then requested that the claim be presented showing what comparative costs would have been expended by like subcontractors, using estimated costs even though the United States has generally not accepted costs that might have been incurred by another company to determine quantum. Plaintiff reacted, as directed, by obtaining comparative estimates for the work it performed, contract and non-contract, from three other landscape firms in the area. Each estimate reflected costs that would have been incurred within the period that JCL performed its work on the project. Interestingly, the estimates were higher than JCL's actual claimed costs and defendant's own landscape architect estimated that the cost of the JCL subcontract to be within $2,000 of plaintiff's claim. Mr. Thurman finally reacted to the JCL claim by refusing to consider any claims until the project was completed even though it was he who had asked for the original cost figures. After receipt of claimed costs based upon total, actual, and comparative estimated costs, Mr. Thurman requested an audit by the Defense Contract Audit Agency (DCAA). A DCAA auditor reviewed the supporting documentation at JCL's former counsel's office. The auditor spent several days reviewing the documents which were admittedly sketchy for the reason stated. While there, the auditor also reviewed JCL's actual costs. Following the DCAA audit, defendant informed plaintiff that it would negotiate only on the basis of actual costs incurred.

These flip-flops by defendant, demanding first the submission of plaintiff's claim in one form, then another, and then yet another, was totally unnecessary and unjustified. In point of fact, the DCAA auditor testified that the claims could have been submitted in any format desired by plaintiff. The court finds inherent in that testimony an admonition to defendant that it had no business dictating to plaintiff how to submit its claim and refusing to negotiate unless the claim was submitted as per defendant's ever-changing whim. Toward the end of January, 1984, Mr. Thurman informed plaintiff that its claimed costs were still too high and, pursuant to instructions

---

**10.** Apparently plaintiff misunderstood defendant's assertion that the May 21, 1984 claim was a "total cost" claim. Defendant was correct. It was a total cost claim because it did not provide a way to determine what costs were incurred under the contract and which were the result of additional work attributable to the differing site condition. For example, plaintiff claimed labor costs but within the category of labor there was no way to distinguish what labor costs resulted from the original contract and which costs resulted from the differing site condition.

from the Resident Officer in Charge of Construction (ROICC), no claims would be negotiated until defendant had issued a contracting officer's final decision. Regretfully, no contracting officer's decision was ever issued. No explanation acceptable to the court was ever given by defendant for the failure of the contracting officer to issue the contracting officer's decision but some light was thrown on the issue during Mr. Thurman's direct examination. It appears that senior officers in the Department of Navy were of the opinion that plaintiff was entitled to more of an equitable adjustment than Mr. Thurman or the ROICC were willing to accept. The court draws the inference from this that the bureaucracy chose to remain mute rather than air its differences of opinion.

Plaintiff then resubmitted its original actual cost claim with certain refinements, corrections and additions in the amount of $699,000. In late 1985 defendant informed plaintiff that it had run out of available funds for the fiscal year and could not negotiate or even discuss a settlement until more funds had been appropriated. It is unfortunate statements such as this that lend credence to the view that defendant intentionally delayed negotiations and the court's awareness of just how poorly the contract had been managed. Defendant may not have been authorized to obligate funds but the court can find no credible basis for its refusal to negotiate even though any payments would have been dependent upon subsequent appropriations.

The apparent overriding problem appears to have been defendant's insistence that its entitlement to a deduction per Change Order 20 was inviolate and took precedence over any discussion of quantum for the differing site condition claim. Defendant's deductive price was obviously unacceptable to plaintiff. Moreover, according to plaintiff, the only way a more detailed claim could have been compiled was for plaintiff to have utilized the out-dated concept of the "clerk of the work," i.e., where an architect, paid by the owner, kept scrupulous, detailed records of every event that occurred throughout the course of the entire contract. The list of items and events would be endless and impossible in today's economy, especially in the present action where defendant's absolute goal was to minimize costs. In the absence of a "clerk of the work," some lesser, more practical standard must be employed with the understanding that the records will necessarily be less specific. Responsible government officers must inspect the work and maintain open communications with its contractors.

The purpose of an equitable adjustment is to recompense a contractor for the difference between what it would reasonably have cost to have performed its contract before the change and the reasonable costs after the change.

It is well established that the equitable adjustment may not properly be used as an occasion for reducing or increasing the contractor's profit or loss, of for converting a loss to a profit or vice versa, for reasons unrelated to a change. A contractor who has underestimated his bid or encountered unanticipated expense or inefficiencies may not properly use a change order as an excuse to reform the contract or to shift his own risks or losses to the Government.

*Pacific Architects & Eng'rs v. United States,* 491 F.2d 734, 739, 203 Ct.Cl. 499 (1974) (citing *Nager Elec. Co. v. United States,* 442 F.2d 936, 945–46, 194 Ct.Cl. 835 (1971); *Keco Indus. Inc. v. United States,* 364 F.2d 838, 849–50, 176 Ct.Cl. 983 (1966), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967); *S.N. Nielsen Co. v. United States,* 141 Ct.Cl. 793, 796–97 (1958)).

According to defendant, plaintiff's claims were evidenced only by invoices and payroll records covering the span of the contract subsequent to the suspension with no breakdown of contract costs vice "extra-contract" costs. Defendant argued that this court has in the past, and should here, reject claims for all unencumbered costs incurred during performance of the contract. Of the various forms of claims demanded by defendant, the actual cost theory is the most preferred in that it uses actual costs from plaintiff's records to de-

termine the cost of the extra work. As plaintiff pointed out, the facts necessary to meet its burden of proof need not be found with "mathematical exactitude." "It is sufficient if [plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate." *Wunderlich Contracting Co. v. United States,* 351 F.2d 956, 968, 173 Ct.Cl. 180 (1965) (citations omitted). All that is necessary is a reasonable showing of the extra costs. Defendant cannot be permitted to benefit from its wrong to escape liability under the guise of a lack of a perfect measure. *See generally Dale Constr. Co. v. United States,* 161 Ct.Cl. 825 (1963).

As the court has already indicated, defendant prior to negotiating plaintiff's claims requested an audit by the DCAA. In fact, at least three audits were conducted. Of the three, the audit pertinent to the claim before the court is the audit of July 26, 1985, Report No. 4151–55172011, mistakenly entitled "Subcontractor's Delay Claim." [11] The DCAA auditor testified that Mr. Thurman had requested an audit of plaintiff's direct costs forward from May 29, 1984, *i.e.,* the period following the suspension. He confirmed that only a "total cost" audit could have been conducted post-May 24, 1984 because of the manner in which plaintiff and JCL kept their books. JCL's proposed claim for the extra work that was the subject of the July 26, 1985 audit had by then risen to $748,518. Of that, DCAA took exception to $92,026, leaving $656,492 for the total cost of performing all work under the contract as amended by Change Order 20.[12] The principal problem encountered by the original auditor was that JCL had not segregated costs by tasks in its records. The DCAA auditor was correct in his conclusion that JCL's costs for the differing site conditions could not be determined under the rules and policies governing an audit.

For the court to find entirely or partially in favor of plaintiff and then not determine the amount of money owed would subject the parties to the burden of further attempts to agree upon quantum, which they have heretofore been unable to do. The polarization of the positions of the parties was so complete by the time of trial that the court believed it would be fruitless to remand the suit to them for negotiation of quantum, even with extensive instructions. The court felt a duty to conclude the case and not to remand it to a certain dead end only to have it reappear on the court's docket. Accordingly, the court studied the entire record for guidance and found that it could fairly make a determination of quantum. The court sat through a complex proceeding but enjoyed the enviable position of observing the demeanor and credibility of each and every witness. The trial was ripe with inconsistent testimony but the court found that it could identify and weigh the preponderance of the evidence, make proper findings of fact and from them draw appropriate conclusions. The court is not as hide-bound to a paper trail nor as limited in its authority to interpret different actions, statements, and events as was the DCAA auditor.

In arriving at its determination of quantum the court used information developed during the course of the trial and weighed it within the concept of a jury verdict theory of recovery. Notwithstanding that a judge of this court is the sole trier of fact, the court has held that a jury verdict approach to the computation of damages is proper when it is not possible for the plaintiff to prove actual damages, but sufficient information exists to enable the court to arrive at a fair approximation of the damages. *Specialty Assembly & Packing Co. v. United States,* 355 F.2d 554, 572, 174 Ct.Cl. 153 (1966); *California Canners & Growers Assoc. v. United States,* 9 Cl.Ct.

---

**11.** The audit was not for the delay caused by the suspension of work which was the subject of an earlier audit subsequently settled by the parties, but of the extra work caused by the differing site condition.

**12.** When DCAA "takes exception" to a cost item it is a statement that in its professional opinion the item should not be paid at the claimed amount. DCAA very rarely determines entitlement to a claim; rather, it seeks to determine the value of a claim. The using agency must determine whether a valid claim exists.

774, 785 (1986). The approximation of damages thus becomes the long-sought quantum. *See Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 742, 209 Ct.Cl. 643 (1976); *W.R.B. Corp. v. United States*, 183 Ct.Cl. 409, 425 (1968); *Salem Eng'g & Constr. Corp. v. United States*, 2 Cl.Ct. 803, 808–09 (1983) (citations omitted). This court was faced with the same dilemma encountered in *Delco Elecs. Corp. v. United States*, 17 Cl.Ct. 302 (1989). The court in *Delco* was

> confronted with varying amounts of conflicting yet competent evidence on the appropriate amount for a reasonable recovery. The defendant raised serious questions concerning the accuracy and reliability of the claims presented in several of the exhibits. Although the fact-finding mission of a trial should ideally clarify the facts of a case, and ultimately should bring the litigants closer together in reaching a just outcome, such has not occurred here. Perhaps it is a peculiar dysfunction of the adversarial process that the parties, as a result of this litigation, are even farther apart than they were when it began.
>
> Where a court or a board of contract appeals sitting as the finder of fact is confronted with competent but conflicting evidence on what is a reasonable amount for an equitable adjustment, it may employ what is referred to as the "jury verdict approach." The court may adopt the jury verdict approach where, (1) there is clear proof that the contractor was injured, (2) there is no more reliable method for computing damages, and (3) the evidence adduced is sufficient for the court to make a fair and reasonable approximation of the damages.

*Id.* at 323 (citations omitted).

The conceptual touchstone for the use of the jury verdict approach is the existence of conflicting competent evidence calling into question the accuracy and reliability of the plaintiff's computations. As the name implies, the technique by necessity requires application of the fair and informed discretion of the trial judge. The court believes that the use of the approach is especially appropriate here, where the principal source of guidance is the rather nebulous concept of "reasonableness." In *Johnson, Drake & Piper, Inc.*, 65–2 B.C.A. ¶ 4868, 1965 WL 856 (1965), the Armed Services Board of Contract Appeals discussed the application of the jury verdict approach in terms that are particularly appropriate here. It stated:

> There is neither a single nor a precise method of arriving at the dollar amount of an equitable adjustment. In general we seek to reach a figure as an equitable adjustment which represents the cost to a reasonably efficient contractor of performing the changed work under his contract. Evidence of this amount may be found in the actual costs of the particular contract, to the extent that those costs are not shown to be other than reasonable, and in engineering estimates of reasonable cost made by experts who bring into play their experience and knowledge to attempt to visualize the price at which that reasonably efficient contractor could perform. Neither estimating nor accounting are such exact arts that either can produce figures which will be agreed to by all parties without legitimate argument. We recognize that often, despite protestations to the contrary, extreme positions on monetary entitlement are taken during litigation. We think that this case is no exception.
>
> Even though presented with wildly divergent monetary positions by the parties before us, we cannot escape the necessity of bringing an end to the matter and determining a figure as the amount of an equitable adjustment. This ordinarily is the figure some place between the amount contended for by each party to the litigation. Sometimes the courts have referred to such a conclusion as an amount in the nature of a "jury verdict." This is a figure which in the view of the trier of facts is fair in light of all the facts of the case, or, put another way, is supported by consideration of the entire record.

*Id.* at 23,073. The court wholeheartedly adopts this explanation of the jury verdict method of determining quantum.

■ The court began its analysis with the base cost to landscape areas A and B following the issuance of Change Order 20. As already established, JCL intentionally, and with full knowledge of its impact, bid fifty-one cents a square foot for the full 903,000 square feet of Phase III. Change Order 20 reduced the area to be landscaped to 469,560 square feet. However, 35,900 square feet were subsequently added to areas A and B. This brought the total landscaped area to 505,460 square feet, fifty-five percent of the original area. Therefore, in determining an initial price for the work remaining after Change Order 20, the court multiplied the 505,460 square feet by the bid cost of fifty-one cents to arrive at the base subcontract price of $257,785. Ordinarily, a relatively small deletion of work under a government contract can be transposed directly into an equitable adjustment using constant factors. A reduction of forty-five percent poses a different problem.[13] Loss of economy of scale was mentioned several times by witnesses but only in passing through other, more hotly contested, issues. The court would be very hard-pressed indeed to determine what factor to apply to the cost of the equitable adjustment for loss of economy of scale if it were not for a reference to "Loss of Productivity—Large Job vs. Smaller Job ..." in defendant's "Estimate for Change Order" dated January 4, 1985. There, defendant's estimator, concluded that the loss of economy of scale to plaintiff was 17.6 percent. Based upon the record as a whole and the total lack of any other verifiable guidance on the issue, the court accepted defendant's finding that a 17.6 percent increase would fairly reimburse JCL for increased costs caused by the loss of economy of scale. Seventeen and six-tenths percent added to plaintiff's reduced contract price of $257,785 gave an adjusted contract base price of $303,155. Under these circumstances, any more of an increase would be beyond what JCL was entitled, whereas any less would

be unfair to JCL. In selecting this figure the court kept in mind that any approximation must be reasonable but that it need not be determined with mathematical exactitude. *W.R.B. Corp. v. United States*, 183 Ct.Cl. 409, 425 (1968) (citations omitted).

■ In searching the record for guidance of how to determine the damages suffered by JCL by virtue of the differing site condition, the court found that the most credible evidence came from Mr. Lance Edmunson, the owner/operator of Lynx Bobcat Service, who testified that he had originally estimated his total cost to perform his task on the project to be $30,-000. His records, unlike plaintiff's and JCL's, were kept in such a manner that he could show to the satisfaction of the court that it cost him an additional $8,100 to perform the extra work caused by the differing site condition, an increase of twenty-seven percent. Fortuitously, Mr. Edmunson apparently bore the main brunt of the extra effort; his task was to remove the thatch and roots and grade the surface. In so doing, he directly encountered, more than any other person or firm, the material that constituted the differing site condition. As he testified, that material "impeded" his performance, as reflected in his cost of performance, by twenty-seven percent. From this, the court reasonably deduced that JCL directly incurred fair and proximate additional costs of at least twenty-seven percent over and above its original contract price, as adjusted for the loss of economy of scale. Twenty-seven percent of plaintiff's subcontract price of $303,155 as previously adjusted for loss of economy is $81,852. That added to $303,155 is $385,-007. This is a major part of the amount of the equitable adjustment to which JCL is entitled for the differing site condition. Since this figure evolved directly from the original subcontract price which included direct and indirect costs, and profit, it too includes these cost items.[14]

---

**13.** The court considered whether the deduction to the contract amounted to a "cardinal change" but concluded, upon analysis of the record, that it did not.

**14.** DCAA, in its audit of July 6, 1985, concluded that profit was excluded under the "Government Delay of Work" clause, DAR 7–104.77. That clause is not in the contract and, as a matter of law, profit is allowable on the claims arising

## 2. *Quantum for various other claims*

■ JCL also submitted some claims that are outside of the general umbrella of claims described above. One was a claim preparation cost of $15,000. DCAA found that the claim was exclusively comprised of attorneys' fees incurred in preparing claims to be presented to the contracting officer. As such it is a proper factor to be included in the equitable adjustment and the court will allow the claim even though it is aware that plaintiff intends to make a claim for attorneys' fees for litigation costs under the Equal Access to Justice Act to which it may or may not be entitled. Further, during the performance of its contract, JCL encountered broken city-owned subsurface concrete boxes containing water delivery and water meter equipment. The record shows that defendant tacitly agreed that JCL should repair and/or reset those boxes. Had those boxes not been repaired and/or reset, JCL could not have completed landscaping the area nor installed its underground lawn watering system. For this plaintiff claimed a total of $1,608. Defendant did not object to that claim and in the opinion of the court the claim should be allowed in its entirety not as a differing site condition but as an equitable adjustment for extra work performed under the Changes clause of the contract. In addition, because of the scale-back of the project, plaintiff incurred an additional $15,000 cost as a premium on its payment and performance bond. Having heard no objection from defendant, and approval by DCAA, the court allowed the $15,000 bond payment claim in full.

To recapitulate, the court has found that the adjusted contract price was $385,007. To that the court added $15,000 for claim preparation costs, $1,608 for the repair of city owned subsurface water boxes, and $15,000 for the increased premium on the performance and payment bonds for a total of $416,615. By use of the jury verdict method of computation of quantum in this fashion, *i.e.*, a determination of JCL's loss of economy of scale and adding a fair and

realistic, but not necessarily mathematically precise, amount for extra costs caused by the differing site condition, and separate not included items, the court did not have to address each and every other claim made by JCL, all of which were total cost in nature and firmly disputed by defendant. Had the court been required to follow the latter course, it seriously doubts that it could ever have arrived at a determination of quantum.

This, however, does not end the matter. The completed discussion focused only on costs and loss of profit incurred by JCL arising out of extra work found to be caused by the differing site condition. Plaintiff, Dawco, is also entitled to an equitable adjustment to its overhead costs. Fortunately, the parties stipulated to these percentages on May 24, 1984, memorialized in a letter from Mr. Thurman to Mr. Benson, president of Dawco. Without going into the reasons why, the parties formally agreed that Dawco was entitled to a "field office rate of 10%, a home office rate of 7.2%, and a prime on subcontractor rate of 10%...." Plaintiff Dawco is therefore entitled to $41,662 for its field office overhead, an equal amount for its prime on subcontractor cost and $29,996 for its home office overhead for a total of $113,320.

## 3. *Interest*

■ Inasmuch as the court has determined that plaintiff is entitled to an equitable adjustment, it is also entitled to interest on that amount from the point in time that a properly certified claim was made in writing to the contracting officer, or his designee, until the date of payment. However, the parties dispute when a certified claim was submitted.

The Contract Disputes Act of 1978, 41 U.S.C. § 605, states that

> Decision by contracting officer
>
> (a) Contractor claims
>
> All claims by a contractor against the government relating to a contract shall

under the "Differing Site Conditions" clause. *See United States v. Callahan Walker Constr. Co.,* 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49 (1942);

*Folk Constr. Co., Inc. v. United States,* 2 Cl.Ct. 681, 689 (1983).

be in writing and shall be submitted to the contracting officer for a decision. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor.

      \*     \*     \*     \*     \*     \*

(c) Amount of claim; certification ...

   (1) ... For claims of more than $50,-000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

Section 611 of Title 41 states that

   [i]nterest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to section 605(a) of this title from the contractor until payment thereof. The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board.

*See also Essex Electro Engineers, Inc. v. United States*, 702 F.2d 998, 1004 (Fed.Cir. 1983). To the contrary, a contractor who did not certify its claim in excess of $50,-000, or whose certification did not meet the requirements of 41 U.S.C. 605(c)(1), shall, at the very least, not be entitled to interest. *ReCon Paving, Inc. v. United States*, 745 F.2d 34, 40 (Fed.Cir.1984). A request for money filed by a contractor in excess of $50,000 that is not certified cannot be considered a "claim" pursuant to 41 U.S.C. § 601–613 and the Disputes Clause of the contract.

   There is no dispute that plaintiff here did certify its claim thereby meeting the jurisdictional requirement for direct access to this court. *Triax Co. v. United States*, 17

Cl.Ct. 653, 657 (1989). In an abundance of caution, counsel for plaintiff submitted a recertification of the Dawco claim to Mr. Thurman on April 2, 1986. The reason for the recertification was in response to a statement made by Mr. Thurman that in his opinion the claim had not theretofore been certified. This was not the case and, as stated by counsel for plaintiff in his cover letter to Mr. Thurman, it was sent with the express reservation of its argument that the claim had been certified in May of 1984 and again in May, 1985. Counsel did not mention it in his letter but plaintiff had also certified the claim on January 9, 1986 in a letter, enclosing a copy of the claim, to the Resident Officer in Charge of Construction. Plaintiff argued that it properly certified the claim on May 21, 1984. Defendant argued that the first time the full claim in litigation had been certified occurred on April 2, 1986.

   Defendant explained that the merit of its position can be seen from a review of correspondence from plaintiff. In April of 1985, Dawco submitted a claim for JCL's costs but stated that it "has not added the cover sheet for markup as entitled but will do so after the negotiated amount is consummated." According to defendant the certification was not valid because the claim did not include Dawco's overhead claim. In June of 1985, defendant received an allegedly different claim. Another revised subcontractor's claim was received on September 24, 1985. On November 22, 1985, yet another claim was received. The latter claim was the one that was the subject of the April 2, 1986 certification. It is only from this April 2, 1986 certification that defendant argues interest may be computed and paid. The court does not agree.[15]

   On April 9, 1984, plaintiff submitted a document setting forth its estimated costs to complete the project. That "cost estimate" was certified but need not have been for two reasons. Firstly, it was, as the name implies, a cost estimate. It cannot be

---

**15.** The issue is confused by the submission of so many claims by plaintiff. The fault for the multiple claims, however, can at least partially be placed at the doorstep of defendant. Defendant, it will be remembered, demanded claims in three different formats. While perhaps different in form, appearance, and dollar value, the claims were nevertheless for the same differing site condition.

read as constituting a claim. Secondly, and more importantly, it was sent to defendant fifty days prior to issuance of the May 29, 1984 notice of termination of the suspension and appears to focus primarily on the delay claim. Plaintiff's next substantive claim was a claim and not merely a cost estimate. It was dated May 21, 1984. The only other claim submission that need be considered was sent to defendant on May 6, 1985.

Both of the latter two claims were certified using the mandatory language of 41 U.S.C. § 605(c)(1) and the Disputes Clause of the General Conditions of the contract, paragraph 6(c)(1) and (d). Defendant objected to the May 6, 1985 submission because it included JCL's claim for an equitable adjustment but not plaintiff's. Mr. Thurman asked, "What did Dawco certify?" The court believes that the May 6, 1985 certified submission was proper even though plaintiff did not include its claim because any costs due Dawco were strictly overhead costs. It had incurred no direct costs and on May 24, 1984, nine months earlier, Mr. Thurman and Mr. Benson had negotiated plaintiff's overhead rates. These rates were, as we have seen, percentages of JCL's costs under the differing site conditions claim. The court must conclude that as of May 6, 1985, defendant had knowledge of the full claim and could have addressed it. The lack of Dawco's specific amount due, had defendant honored JCL's claim in dollars, did not render the claim a nullity. Moreover, the purpose of the certification is to assure the government that the claim amounts were honestly and accurately stated. Dawco's overhead amounts had already been accepted by defendant as accurate and honest. The failure to specifically include them was, if anything, a technicality of the kind that this court will not consider to deny monies due plaintiff. To do so would emphasize form over substance and be a useless act. *See Curley, Inc. v. United States*, 6 Cl.Ct. 274, 277 (1984). The court is of the opinion that the May 6, 1985 claim was properly certified and submitted to defendant.

For the same reasons, the court also finds, but for one factor, that the submis-

sion of May 21, 1984 was likewise properly certified and submitted to defendant. That claim was also directed only to JCL's costs for the differing site condition and it did not contain Dawco's overhead claim. However, prior to its submission, Messrs. Benson and Thurman had discussed plaintiff's overhead costs and on May 24, 1984, three days after submission of the May 21, 1984 claim, and before that claim was rejected, the parties had reached accord on plaintiff's overhead. The court finds that within these time frames, it was unconscionable for defendant to refuse to recognize the claim. The May 21, 1984 document constituted JCL's claim for an equitable adjustment and the costs were certified as made in good faith, accurately supported, complete to best of Mr. Benson's knowledge and belief, and reflected the equitable adjustment for which he believed the government liable. 41 U.S.C. § 605(c)(1). All that was missing were plaintiff's overhead costs. Those amounts would be expressed in percentages of the JCL claim and were then under negotiation, and finalized within three days of the May 21, 1984 claim. More importantly, the court cannot find a need to certify plaintiff's overhead claim inasmuch as defendant agreed to the overhead percentages without requiring or waiting for a certification from Dawco. The claim presented to Mr. Thurman on May 21, 1984 was the same claim filed in this court except for the amount of damages. *See Curley, Inc. v. United States*, 6 Cl.Ct. 274, 277 (1984). In these circumstances the court finds it proper to conclude that the claim was properly certified and submitted to the contracting officer on May 21, 1984. Defendant cannot be permitted to disavow its agreement of May 24, 1984 with Dawco that established plaintiff's overhead rates made under the terms of the contract and within the context of the differing site conditions claim. The fact that the dollar values changed during the course of the administration of the contract and the amount finally claimed before this court is immaterial. *See Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed.Cir.1984) (it would be too disrup-

tive of the litigation if any increase in the claim had to be submitted to the contracting officer before the court could go forward with its adjudication of the case).

## CONCLUSION

Following review of the entire record, the court determined, for the reasons set forth above, that plaintiff encountered a Type I differing site condition under its contract to landscape Areas A and B under Phase III of the Cabrillo–Larkdale Housing Project and was entitled to an equitable adjustment to the contract of $529,935 plus statutory interest. The court need not balance plaintiff's entitlement to an equitable adjustment against the original subcontract price or defendant's deductive claim since the computation of damages was based upon the Change Order 20 adjusted subcontract price.

The final figure of $529,935 represents the damages suffered by plaintiff and JCL due to extra work caused by the differing site condition; $416,615 to plaintiff on behalf of JCL and $113,320 to plaintiff for earned agreed-upon overhead expenses. Therefore, plaintiff is entitled to $529,935 with interest pursuant to 41 U.S.C. § 611 (1982) from May 21, 1984.

The Clerk of the court is directed to enter judgment accordingly.