URS GROUP, INC., Plaintiff–Appellant,

v.

TETRA TECH FW, INC. and Foster Wheeler Environmental Corporation, Defendants–Appellees.

Nos. 06CA1243, 06CA2220.

Colorado Court of Appeals, Div. VI.

Feb. 7, 2008.

Koncilja & Associates, P.C., Frances A. Koncilja, Zeb Schorr, Denver, Colorado; Smith Pachter McWhorter, P.L.C., Val S. McWhorter, W. Stephen Dale, Vienna, Virginia, for Plaintiff–Appellant.

Hall & Evans, L.L.C., Alan Epstein, Denver, Colorado; Coats Rose Yale Ryman & Lee, P.C., William M. Coats, Michael L. Burnett, Houston, Texas; Berg Hill Greenleaf & Ruscitti LLP, Richard F. Greenleaf, Heidi C. Potter, Boulder, Colorado (On the Answer Brief), for Defendants–Appellees.

Opinion by Judge VOGT.

In this dispute concerning compensation for remediation work at the Rocky Mountain Arsenal, plaintiff, URS Group, Inc., appeals the trial court judgment awarding it only a portion of the relief requested in its complaint against defendants, Tetra Tech FW, Inc. and Foster Wheeler Environmental Corporation (collectively, TTFW). URS also appeals the court's order awarding costs to TTFW. We affirm the judgment in part and reverse it in part, reverse the order awarding costs, and remand for further proceedings.

TTFW was the program management contractor for the arsenal remediation project under a contract with the United States Army. In 2001, TTFW issued a request for proposal (RFP) seeking bids for a soil remediation project with attendant foundation demolition work. URS submitted a bid of $10,857,570 and was awarded the subcontract.

After demolition began, URS encountered problems removing the foundations. Claiming that the concrete footings and structures it encountered did not conform to the information contained in the RFP materials, URS submitted contract change notification (CCN) 21, which sought reformation of the subcontract to increase the price by $9,166,925, the amount of URS's additional costs attributable to the subsurface conditions it encountered. URS claimed entitlement to such additional compensation under the contract's differing site conditions (DSC) clause, which provided for an equitable adjustment if subsurface conditions differed materially from those indicated in the contract.

When TTFW refused to pay additional compensation, URS brought this action. In addition to asserting other claims that are not at issue in this appeal, URS sought relief on its CCN 21 differing site conditions claim on theories of breach of contract, breach of the duty of good faith and fair dealing, mutual mistake, equitable adjustment, and negligent misrepresentation. Following a bench trial, the court found in favor of TTFW on all the CCN 21 claims. After offsetting certain sums to which TTFW was entitled on its counterclaim, the court awarded URS $1,143,610.50 on its other claims.

TTFW subsequently moved for costs pursuant to section 13–17–202, C.R.S.2007, on the basis that URS's recovery at trial was less than the offer of settlement TTFW had made. The trial court agreed and awarded TTFW costs in the amount of $168,628.54.

## I. CCN 21 Differing Site Conditions Claims

URS contends that the trial court erred in denying any recovery on its CCN 21 claims relating to the subsurface conditions at the arsenal. We agree in part.

### A. Governing Law and Standard of Review

■ The parties' contract provides that "[t]his Subcontract shall be governed by the laws of the State of New Jersey." It is undisputed that such a choice of law provision is enforceable. See TerraMatrix, Inc. v. U.S. Fire Insurance Co., 939 P.2d 483, 490 (Colo.App.1997); Kramer v. Ciba–Geigy Corp., 371 N.J.Super. 580, 854 A.2d 948, 959 (App.Div.2004). We therefore apply New Jersey law in analyzing the contract claims in this case. In so doing, we recognize that New Jersey courts rely on federal case law addressing government contract issues when there are no applicable New Jersey state court decisions. See M.J. Paquet, Inc. v. N.J. Dep't of Transportation, 171 N.J. 378, 794 A.2d 141, 149 (2002); P.T. & L. Construction Co. v. State, 108 N.J. 539, 531 A.2d 1330, 1334 (1987).

■ Additionally, as in Colorado, a trial court's interpretation of a contract is reviewed de novo. See M.J. Paquet, 794 A.2d at 152; Hutnick v. ARI Mutual Insurance Co., 391 N.J.Super. 524, 918 A.2d 729, 732 (App.Div.2007). The trial court's findings of fact are reviewed to determine "whether there is sufficient credible evidence in the record to support [them]." P.T. & L. Construction, 531 A.2d at 1341.

### B. Assumption of Risk

The trial court found that TTFW had information about subsurface conditions at the arsenal that it did not disclose to bidders

during the bid solicitation period, and it further found that neither of the parties to this action had apparently anticipated the difficulties that would be encountered in removing the foundations. The court nevertheless concluded that URS was not entitled to compensation on its CCN 21 claims because, by entering into a fixed price contract, URS had assumed the risk of encountering unknown subsurface conditions. The court stated:

> The demolition portion of the contract was a fixed price contract and the risks associated with unknown subsurface quantities and configurations of concrete were assumed by [URS].... [URS's] mutual mistake and differing site conditions claims are based upon the presence of large and irregularly shaped foundations. The risk of such a contingency was assumed by [URS] under the terms of the contract.

URS contends that this ruling "ignored the fundamental risk-allocation function of the subcontract's differing site conditions clause." We agree.

### 1. DSC Clause in Fixed Price Contracts

■ A contractor who enters into a fixed price services contract with no DSC clause assumes the risk that its cost of performance will be higher than the contract price. *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1304–05 (Fed.Cir.1996) ("Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract."). If URS had assumed such a risk, it would not have been entitled to recovery on its breach of contract or mutual mistake claims. *See National Presto Industries, Inc. v. United States*, 167 Ct.Cl. 749, 338 F.2d 99, 105–08 (1964).

However, the fixed price subcontract between URS and TTFW incorporated by reference the standard federal DSC clause. That clause provides, in relevant part:

> (a) The Contractor shall promptly, and before conditions are disturbed, give written notice to the Contracting Officer of (1) subsurface or latent physical conditions at

the site which differ materially from those indicated in this contract....

> (b).... If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract ... an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

48 C.F.R. § 52.236–2 (2007); *see also* 48 C.F.R. § 36.502 (2007) (requiring insertion of DSC clause in certain fixed price contracts and permitting its insertion in others).

The purpose of the DSC clause is "to take at least some of the gamble on subsurface conditions out of bidding." *Foster Construction C.A. & Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 435 F.2d 873, 887 (1970); *P.T. & L. Construction*, 531 A.2d at 1335. The clause encourages more accurate bidding, a benefit to the party seeking bids, because the contractor does not have to inflate its bid to account for contingencies that may not occur. *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1343 (Fed.Cir.1998); *Foster Construction*, 435 F.2d at 887; *P.T. & L. Construction*, 531 A.2d at 1335.

■ Where a fixed price contract has a DSC clause, the contractor may be entitled to an equitable adjustment if subsurface conditions are materially different from those indicated in the contract. *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1274 (Fed.Cir.2001); *ACE Constructors, Inc. v. United States*, 70 Fed.Cl. 253, 268–69 (2006), *aff'd*, 499 F.3d 1357 (Fed.Cir.2007); *P.T. & L. Construction*, 531 A.2d at 1334.

■ Thus, the trial court erred in concluding that URS could not recover additional compensation for differing subsurface conditions simply because it had entered into a fixed price contract.

### 2. Other Contract Provisions

■ We do not agree with TTFW that, notwithstanding the DSC clause, URS assumed the risk of differing subsurface conditions under other provisions of the parties' contract.

■ Courts are reluctant to frustrate the purpose of the DSC clause by relying either on other contractual provisions that shift liability to the contractor to investigate site conditions or on broad general exculpatory clauses in the contract. *See Foster Construction,* 435 F.2d at 887–88; *Morrison–Knudsen Co., Inc. v. United States,* 184 Ct. Cl. 661, 397 F.2d 826, 841 (1968); *North Slope Technical Limited, Inc. v. United States,* 14 Cl.Ct. 242, 252 n. 25 (1988); *P.T. & L. Construction,* 531 A.2d at 1335–36.

In support of its argument that the "contract's plain language places the risk on URS," TTFW first cites Article 19 of the contract, entitled Jobsite Conditions, which states:

Subcontractor warrants that Subcontractor and its employees are familiar with the Work, the Jobsite and its environs, the availability of and access to medical and emergency services, and the physical and other conditions, *including hazardous substances, materials, agents or vapors, both surface and subsurface,* which may exist at the Jobsite, the previous use of the Jobsite and all other matters in connection with or relevant to the safe, proper and efficient conduct of the Work to be performed under this Subcontract and that Subcontractor has made allowance for any and all such conditions and contingencies in its pricing.

(Emphasis added.)

In Article 19, URS warranted familiarity with "physical and other conditions, including hazardous substances, materials, agents, or vapors, both surface and subsurface," which might exist at the job site. "Subsurface" refers back to "hazardous substances, materials, agents, or vapors." It does not amount to a warranty of familiarity with subsurface conditions that are not "hazardous substances, materials, agents, or vapors," and it does not override the DSC clause. *See North Slope Technical Ltd.,* 14 Cl.Ct. at 252 n. 25 (rejecting argument that clause analogous to Article 19 "overrides the differing site conditions clause").

TTFW also relies on (1) the contract's "Schedule of Values Summary," in which URS provided a subtotal for its demolition work activities and acknowledged responsibility for "developing material take-offs" used to establish pricing, and (2) questions and answers in contract amendment three that show TTFW's rejection of URS's questions about pricing of and payment for demolition of the foundations. However, these provisions simply reflect that the contract is a fixed price contract, and that the fixed price covers subsurface demolition work. Particularly in light of the policy against reading general contract provisions broadly to defeat the purpose of the DSC clause, we decline to read these provisions as establishing that URS assumed the risk of subsurface conditions.

### 3. Assumption of Risk by Conduct

Nor do we agree with TTFW that URS assumed the risk by "ignoring available information," by including a $103,000 contingency in its bid, or by submitting a lump sum bid when it knew it did not have complete information about all the foundations.

■ Including a small contingency in a bid does not preclude a contractor from receiving an equitable adjustment under the DSC clause if the contractor later encounters subsurface conditions that differ materially from those indicated in the contract. In *North Slope,* the court held that a contractor was entitled to an equitable adjustment for a differing site condition it encountered during contract performance. While it would have been "reasonable and prudent," based on the information available at the time of contracting, for the contractor to have included a small "risk factor" in its bid, the presence of the DSC clause in the contract meant that the contractor was not required to set its estimate "on the basis of the worst possible conditions that might be encountered." 14 Cl.Ct. at 258 (quoting *Ruff v. United States,* 96 Ct.Cl. 148, 164 (1942)).

■ Similarly here, while it was reasonable for URS to factor in a relatively small contingency for variations in concrete foundation volume based on the risks identified as of the time URS was preparing its bid, the fact that it did so does not preclude it from subsequently obtaining an equitable adjust-

ment if it can establish the elements of a DSC claim.

■ Further, while contractors have a duty to review information that is explicitly mentioned and made available for inspection by the contract documents, they have no duty to conduct an independent investigation or review documents not mentioned in the contract. *See Foster Construction*, 435 F.2d at 887 (DSC clause "makes it clear that bidders are to compute their bids, not upon the basis of their own preaward surveys or investigations, but upon the basis of what is indicated and shown in the specifications and on the drawings"); *North Slope*, 14 Cl.Ct. at 252–54 (rejecting arguments that contractor's pre-bid site investigation was inadequate and that contractor should have obtained additional data on subsurface conditions, where availability of such data at a different location was pointed out in bidding documents); *cf. Randa/Madison*, 239 F.3d at 1272 (contractor had duty to review soil test results where contract explicitly notified it that the results were available for inspection).

■ Although TTFW argues that URS ignored as-built drawings that could be found in the Rocky Mountain Arsenal library, the trial court found that (1) the RFP "did not contain, nor was it amended to contain, any specific references to or copies of as-built or design drawings of the foundations to be demolished"; (2) "[t]he RFP designated particular specifications and drawings relevant to the demolition work and directed offerors to rely on those drawings and specifications to perform the work"; (3) TTFW "advised bidders that strict adherence to the RFP was critical"; and (4) although TTFW orally advised bidders that " 'limited drawings' had been assembled for viewing," it did not incorporate such drawings into the RFP or "index, list, or otherwise document" the drawings during the solicitation phase. TTFW does not dispute these findings. Thus, because the as-built drawings were not referenced in the RFP, and TTFW directed offerors to rely strictly on the RFP, URS did not have a duty to review these drawings before submitting its bid.

■ Finally, as discussed above, the DSC clause permits contractors to enter into fixed price contracts in reliance on the information disclosed to them. Thus, URS is not deemed to have assumed the risk of materially differing subsurface conditions merely by submitting a lump sum bid based on the information available to it.

### B. TTFW's Arguments for Affirmance on Other Grounds

Having concluded that URS did not assume the risk of the subsurface conditions it encountered and that the trial court erred in so ruling, we must next consider whether the judgment may nevertheless be affirmed on one of the alternative grounds urged by TTFW. *See Negron v. Golder*, 111 P.3d 538, 542 (Colo.App.2004) (court of appeals may affirm correct result on different grounds). As discussed below, we conclude that URS was not entitled to recovery on its CCN 21 claim on a theory of breach of the covenant of good faith and fair dealing. However, we cannot conclude as a matter of law that URS will be unable to establish entitlement to recovery on that claim under one of the other theories asserted in its complaint.

#### 1. Failure to Provide Timely Notice

TTFW argues that URS cannot recover for differing subsurface conditions because it failed to provide timely notice of its DSC claim. The trial court made no findings on this issue, and we conclude that a remand is required to decide it.

■ The DSC clause requires a contractor to give notice of materially differing subsurface conditions "promptly, and before conditions are disturbed." However, the notice need not be in any particular form. All that is necessary is that the government—or, here, the program management contractor— be generally informed of the facts surrounding the claim. The communication need not be accompanied by detailed documentary evidence. *Dawco Construction, Inc. v. United States*, 18 Cl.Ct. 682, 693 (1989), *rev'd in part on other grounds*, 930 F.2d 872 (Fed.Cir. 1991), *overruled by Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1578–83 (Fed.Cir.1995); *see also ACE Constructors*, 70 Fed.Cl. at 273

(notice "need not follow any specific format, but must merely make the Contracting Officer aware of the differing site condition").

■ Once notice is given, it need not be given again when the same conditions recur on the site. Additionally, the notice requirement may be waived if the government had actual or constructive notice of the conditions encountered. *Dawco*, 18 Cl.Ct. at 693. The party seeking recovery on a DSC claim bears the burden of proving that notice was given. *Id.*

■ Moreover, "[b]ecause the purpose of the notice requirement is to allow the government to mitigate costs that might result from the differing site condition, a contractor that fails to provide adequate notice will not be barred from recovery unless the government is prejudiced by the lack of notice." *ACE Constructors*, 70 Fed.Cl. at 272. The government bears the burden of showing prejudice. *Id.*

TTFW argues that URS did not give timely notice when it discovered the "alleged demolition changes" in April 2002. However, the record establishes that on June 6, 2002, URS sent a letter to TTFW's senior subcontracts administrator, indicating that it had fallen behind schedule in part because "the information furnished by [TTFW] relative to nature of the concrete building foundations . . . was inadequate for the purposes of assessing the complete scope and nature of the foundation removal work." Additionally, in May 2002, URS twice requested, and TTFW twice approved, changes to the demolition plan. In one change request, URS described "oversize concrete debris including footings (that have not been previously sized)." These communications at least arguably "generally informed [TTFW] of the facts surrounding the claim." *Dawco*, 18 Cl.Ct. at 693.

■ Moreover, even if URS did not give adequate notice, its DSC claim would not be barred unless TTFW proved that it was prejudiced by the lack of timely notice. *See ACE Constructors*, 70 Fed.Cl. at 272. Although TTFW makes a conclusory allegation of prejudice on appeal, it does not cite to evidence in the record establishing such prejudice,

and, as noted, the trial court made no findings on the issue. Nor did it make findings as to whether, as URS urges on appeal, TTFW waived the notice requirement by having actual or constructive notice of the conditions encountered. *See Dawco*, 18 Cl. Ct. at 693.

Thus, we cannot affirm the judgment based on URS's asserted failure to give timely notice. However, if TTFW again contends on remand that untimely notice bars URS's claims, the trial court shall determine the issue in accordance with the standards set forth above.

### 2. Inability to Establish Elements of DSC Claim

TTFW next contends that URS cannot prove the elements of a DSC claim, and that "the trial court's findings, which are not clearly erroneous, establish URS had no DSC claim." However, the trial court did not make the findings that would establish this contention, and we cannot decide the issue on the record before us.

■ URS asserted a "Type I" differing site conditions claim—that is, a claim asserting that subsurface conditions at the site differ materially from those indicated in the contract. *See* 48 C.F.R. § 52.236–2(a)(1) (2007). To recover on a Type I DSC claim, "a contractor must prove, by preponderant evidence, that: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions." *Comtrol, Inc. v. United States,* 294 F.3d 1357, 1362 (Fed.Cir.2002); *see H.B. Mac,* 153 F.3d at 1345; *ACE Constructors,* 70 Fed.Cl. at 268–69; *Weeks Dredging & Contracting, Inc. v. United States,* 13 Cl.Ct. 193, 218 (1987), *aff'd,* 861 F.2d 728, 1988 WL 90751 (Fed.Cir.1988).

■ In regard to the first element—namely, that "the conditions indicated in the contract differ materially from those actually encountered during performance"—a contractor cannot be eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be. *See Comtrol,* 294 F.3d at 1363 (because contract made no specific representation as to type of soil to be encountered, it could not be said that contractor encountered conditions materially differing from those specifically indicated in the specification); *H.B. Mac,* 153 F.3d at 1345; *Weeks,* 13 Cl.Ct. at 217–20. Although the contract indications "need not be explicit or specific," the documents must still "provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered." *Weeks,* 13 Cl.Ct. at 219, 221 (concluding that, because contract documents did not indicate "any *specific* quantities of particular subsurface materials expected to be the product of the dredging project" (emphasis in original), contractor was not entitled to equitable adjustment based on difference between quantum of subsurface materials depicted and quantum of such materials encountered).

■ Determining whether a contract contains indications of a particular site condition is a matter of contract interpretation. It thus presents a question of law, which is reviewed de novo. *H.B. Mac,* 153 F.3d at 1345; *P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir. 1984) (noting that issue "presents a question of law which may be decided by this court for itself").

Because the contract documents are part of the record before us, we can determine whether they indicate what subsurface conditions would be encountered by URS. We conclude that they do.

■ The contract documents include building histories and "Task 24 sheets" that provide information about some, though not all, of the foundations to be demolished. (TTFW states in its brief on appeal that "subsurface concrete quantities [were] provided in Task 24s for approximately 100 foundations," although it contends that URS

ignored this information.) The Task 24 sheets include specific representations regarding the material and the volume of the particular structure's foundation—for example, as to Building 0213, "Foundation Material: Concrete"; "Standing Building Volume: 3500 cu yds; Above grade foundation: 170 cu yds; Below grade foundation: 40 cu yds." The trial court referenced this information in its findings: "Typically, the Building History forms also contained a 'Task 24 Structures' data sheet that provided information regarding concrete volume in cubic yards. This included the above grade foundation volume in cubic yards, the below grade foundation volume in cubic yards, and the area in square feet." The RFP also included certain drawings showing the configuration and relative surface area of the foundation sites.

We conclude that the contract documents include sufficient indications of the subsurface conditions to satisfy the first element of a DSC claim.

■ TTFW also argues that URS cannot establish the remaining elements of a DSC claim—namely, a material difference in conditions actually encountered, reasonable unforeseeability of such conditions, reasonable reliance, and damages resulting from a material variation. *See Comtrol,* 294 F.3d at 1362. However, these elements implicate factual inquiries that are specifically within the province of the trial court. *See Armstrong v. Francis Corp.,* 20 N.J. 320, 120 A.2d 4, 10 (1956) ("The issue of reasonableness or unreasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances...."); *Simonetti v. Selective Ins. Co.,* 372 N.J.Super. 421, 859 A.2d 694, 695 (App.Div.2004) (causation is a question of fact); *Selective Ins. Co. v. McAllister,* 327 N.J.Super. 168, 742 A.2d 1007, 1013 (App.Div.2000) ("[M]ateriality generally is a question of fact to be determined by a jury."); *Peer v. City of Newark,* 71 N.J.Super. 12, 176 A.2d 249, 255 (App.Div.1961) (foreseeability is a question of fact).

Although the trial court made findings bearing on some of these inquiries, we do not agree with TTFW that its findings "establish

URS has no DSC claim"; and we cannot conclude as a matter of law, based on the record before us, that these elements either have been or have not been established.

Accordingly, this issue must be determined by the trial court on remand. Should the court determine that URS has satisfied all the elements of a DSC claim and that the claim is not barred by the lack of timely notice, URS is entitled to an equitable adjustment of the contract to reflect any increase in its cost of performance caused by materially differing subsurface conditions. *See* 48 C.F.R. § 52.236–2; *H.B. Mac*, 153 F.3d at 1345 (contractor entitled to equitable adjustment if it establishes all the requisite elements of a DSC claim). Any such equitable adjustment may not, however, duplicate sums awarded for the same costs on a different theory of liability. *See DelaCruz v. Borough of Hillsdale*, 183 N.J. 149, 870 A.2d 259, 266 (2005) (while plaintiff was allowed to pursue two separate theories of liability, he was entitled to only one recovery for his loss).

### 3. Mutual Mistake

As discussed above, the trial court found that URS could not prevail on its mutual mistake claim because it had assumed the risk of the subsurface conditions it encountered. We have concluded that URS did not assume that risk. We further conclude that we cannot affirm the trial court's judgment for TTFW on the mutual mistake claim on other grounds, as TTFW urges.

 Under New Jersey law, a party may be entitled to rescind or reform a contract on a theory of mutual mistake if, at the time of contracting, both parties were laboring under the same misapprehension as to a particular, essential fact. The minds of the parties must have met and reached a prior existing agreement which the written document fails to express. *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599, 560 A.2d 655, 659–60 (1989); *Wallace v. Summerhill Nursing Home*, 380 N.J.Super. 507, 883 A.2d 384, 386 (App.Div.2005). A party's negligent failure to know or to discover the facts that resulted in the mutual mistake does not preclude the rescission or reformation of the contract. *Wallace*, 883 A.2d at 386.

 Rescission or reformation of a contract on a theory of mutual mistake is an equitable remedy that lies within the inherent discretion of the trial court. *See First American Title Insurance Co. v. Lawson*, 177 N.J. 125, 827 A.2d 230, 239 (2003); *Weinisch v. Sawyer*, 123 N.J. 333, 587 A.2d 615, 620 (1991).

The trial court made no findings on the elements of a mutual mistake claim, and, on appeal, both parties point to evidence in the record supporting their positions as to the availability of such a remedy. In these circumstances, it is for the trial court to exercise its equitable discretion to determine whether, if URS has not been compensated on a different theory of recovery, it is entitled to recovery on the basis of mutual mistake.

### 4. Breach of the Covenant of Good Faith and Fair Dealing

The trial court found that URS's claim for reformation of the contract on a theory of breach of the duty of good faith and fair dealing presented "a much closer issue" than the breach of contract and mutual mistake claims. However, it concluded that URS could not recover on this claim because TTFW's failure to disclose its full knowledge regarding the foundations was not the cause of URS's difficulties. We agree with TTFW that the trial court properly rejected this claim, but we reach that conclusion for a reason other than that relied on by the trial court.

 "A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 773 A.2d 1121, 1126 (2001). The duty of good faith and fair dealing arises in "the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates*, 182 N.J. 210, 864 A.2d 387, 395 (2005).

Both *Wilson* and *Brunswick Hills* state that the duty of good faith and fair dealing is that set forth in Restatement (Second) of

Contracts § 205 (1981). However, section 205 "does not deal with good faith in the formation of a contract. Bad faith in negotiation [is] not within the scope of this Section." *Id.* § 205 cmt. c.

Although we are unaware of any New Jersey authority directly on point, courts in other jurisdictions have cited Restatement § 205 comment c in concluding that there is no cause of action for breach of the duty of good faith and fair dealing during contract negotiations. *See Wallace v. National Bank of Commerce,* 938 S.W.2d 684, 687 (Tenn. 1996) ("[T]he common law duty of good faith in the performance of a contract does not apply to the formation of a contract."); *Husman, Inc. v. Triton Coal Co.,* 809 P.2d 796, 801–02 (Wyo.1991) (duty of good faith is not imposed on parties until they have reached agreement, and does not bind them during earlier negotiations; thus, excavating company's recourse for mining company's alleged misrepresentation of soil conditions was action for fraud or negligent misrepresentation, not action for breach of implied covenant of good faith and fair dealing).

■ Here, although URS's complaint alleged various violations of the covenant of good faith and fair dealing during performance of the contract, its sole contention on appeal regarding the factual basis for this claim is that "TTFW breached its duty of good faith and fair dealing owed to URS by withholding information during the bidding process." Lack of good faith and fair dealing during the bidding process was also the focus of the trial court's analysis of this claim.

Because, under New Jersey law, a claim for breach of the covenant of good faith and fair dealing cannot be premised on alleged bad faith conduct during contract negotiations, the trial court did not err in denying relief on this claim.

## D. Negligent Misrepresentation

In addition to the contract-based claims discussed above, URS also sought recovery on its CCN 21 claim on a theory of negligent misrepresentation. It alleged that TTFW had negligently provided incorrect information in the RFP and that URS had justifiably relied on the information in preparing its bid. URS contends on appeal that the trial court erred in failing to address its claim, and it asserts that certain trial court findings would establish the elements of negligent misrepresentation. Although TTFW responds that URS cannot prevail on this claim, we conclude that the negligent misrepresentation claim should be addressed on remand if URS has not recovered for the same claimed losses on another theory.

As the parties recognize, this is a tort claim, independent of the parties' contract, and it is therefore governed by Colorado law. Under Colorado law,

> [o]ne who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Keller v. A.O. Smith Harvestore Products, Inc.,* 819 P.2d 69, 71 n. 2 (Colo.1991) (quoting Restatement (Second) of Torts § 552(1) (1965)); *see also BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 74–75 (Colo.2004); *Nelson v. Gas Research Institute,* 121 P.3d 340, 345 (Colo.App.2005).

■ TTFW argues that the economic loss rule would bar any recovery for negligent misrepresentation. *See Grynberg v. Agri Tech, Inc.,* 10 P.3d 1267, 1269 (Colo. 2000) (under economic loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law"). However, because URS alleged that the misrepresentations occurred before the parties entered into their contract, the economic loss rule does not bar the negligent misrepresentation claim in this case. *See BRW,* 99 P.3d at 75; *Keller,* 819 P.2d at 72 ("[A] contracting party's negligent misrepresentation of material facts prior to the execution of an agreement may provide the basis for an independent tort claim asserted by a party detrimentally relying on such negligent misrepresentations.").

### E. Summary

In sum, we conclude that URS did not assume the risk of the differing subsurface conditions it encountered, and that the trial court therefore erred in denying relief on its CCN 21 claim on this basis. On remand, the trial court shall determine whether URS is entitled to recovery on this claim on any of the theories of recovery, other than breach of the duty of good faith and fair dealing, discussed above, and shall make findings in support of its conclusion.

### II. Costs

URS also contends that the trial court erred in awarding TTFW its costs under section 13–17–202. In light of our reversal of the portion of the judgment denying additional recovery to URS, the order awarding costs is necessarily reversed as well. *See Bainbridge, Inc. v. Douglas County Board of Commissioners*, 55 P.3d 271, 274 (Colo.App. 2002). However, because the issue will arise on remand if the trial court determines that URS is not entitled to additional compensation, we address the merits of URS's contention. We agree with URS that, because the settlement offer was contingent upon a non-monetary condition—namely, execution of a release relinquishing future as well as existing claims—TTFW is not entitled to costs under section 13–17–202.

Section 13–17–202 (1)(a)(II), C.R.S.2007, provides that, if a defendant serves a written offer of settlement that is rejected by the plaintiff, "and the plaintiff does not recover a final judgment in excess of the amount offered, then the defendant shall be awarded actual costs accruing after the offer of settlement to be paid by the plaintiff."

Although the statute does not further define the type of settlement offer that comes within its scope, divisions of this court have held that imposition of nonmonetary conditions on acceptance of a settlement offer may remove the offer from the operation of the statute. *See Tallitsch v. Child Support Services, Inc.*, 926 P.2d 143, 148–49 (Colo.App. 1996) (making settlement offer contingent upon application of settlement amount to offset back child support was a nonmonetary condition that removed offer from scope of

section 13–17–202 and supported trial court's refusal to award costs under that statute); *Martin v. Minnard*, 862 P.2d 1014, 1019 (Colo.App.1993) (provisions of settlement agreement that required release of claims beyond those at issue, imposed hold harmless obligations, and mandated confidentiality were "contrary to the purpose of § 13–17–202"; trial court therefore properly declined to award costs under that statute); *see also* John R. Webb, *Revisiting the Recovery of Attorney Fees and Costs in Colorado*, 33 Colo. Law. 4, 11, 18 (Apr.2004) ("An attempt to include a non-monetary term in the offer, such as a general release, probably would remove the offer from the statute's operation.").

Here, URS rejected TTFW's settlement offer, and then recovered less at trial than TTFW had offered. However, TTFW conditioned its offer upon execution of a release "relinquishing all existing and future claims related to the Project giving rise to the litigation." We conclude that, by requiring a release of all "future claims" related to the project, TTFW imposed a nonmonetary condition that took its offer outside the scope of section 13–17–202.

In so concluding, we reject TTFW's argument that its offer in effect simply sought release of the "claims at issue" because the statute of limitations on new tort claims had run and any contract claims were already part of the litigation. Even assuming the statute of limitations for tort claims had run, without a release of future claims, URS would still have been entitled to bring additional contract claims if it had accepted the offer of settlement:

> Unlike a general release, acceptance of a settlement offer probably extinguishes only the claims actually pleaded, leaving the defendant at some risk of future litigation over other claims arising from the same events. The accepted offer may not constitute a judgment for purposes of asserting that *res judicata* bars litigation of claims that could have been raised, as well as of claims that were raised. This is because the statute does not provide for entry of judgment, but only that the offer constitutes "a binding settlement agreement, fully enforceable."

Webb, *supra*, at 18; *see also* 13 James W. Moore et al., *Moore's Federal Practice* ¶ 68.05[6] (3d ed.2007) (discussing preclusive effect of judgment entered on offer of settlement pursuant to Fed.R.Civ.P. 68, the federal analog to section 13–17–202).

Therefore, regardless of whether URS ultimately recovers an amount in excess of that offered by TTFW in its original settlement offer, TTFW is not entitled to costs under section 13–17–202.

### III. Conclusion

URS is entitled to its costs on appeal pursuant to C.A.R. 39(a).

Because neither party challenges the portions of the trial court judgment awarding sums on claims and counterclaims other than URS's CCN 21 claims, that portion of the judgment is affirmed. The portion of the judgment denying relief on the CCN 21 claims is reversed, the order awarding costs is reversed, and the case is remanded for further proceedings in accordance with the views set forth here.

Judge DAILEY and Judge FURMAN concur.